FIFTH DIVISION
June 30, 2010

Nos. 1-08-1006, 1-08-1007 & 1-08-1013 (Cons.)

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| VICTOR RODRIGUEZ, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |
| | ) | |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 93 CR 22832 |
| v. | ) | |
| | ) | |
| OMAR CHAIDEZ, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |
| | ) | |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FRANCISCO MUNIZ, | ) | Honorable |
| | ) | Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the opinion of the court:

In this appeal, we consider the postconviction petitions of three codefendants who complain that their sentences are unconstitutionally disparate to the sentence received by a fourth

1-08-1006, 1-08-1007 & 1-08-1013

codefendant upon resentencing after his successful postconviction petition. Following an evidentiary hearing, the trial court denied the petitions filed by codefendants Victor Rodriguez, Omar Chaidez and Francisco Muniz for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2000)).[1] For reasons that will be detailed below, we affirm the dismissal of their petitions.

THE UNDERLYING TRIALS

In October 1993, Victor Salgado, Victor Rodriguez, Omar Chaidez and Francisco Muniz were charged with two counts for the first degree murder of victim James Manzella, one count for the attempted murder of victim Jason Balthazar and one count for aggravated discharge of a firearm as to Balthazar, which occurred on September 24, 1993. Ultimately, Salgado was tried by jury, simultaneously with Rodriguez's bench trial. Chaidez and Muniz were tried by separate juries. Judge Shelvin Singer presided over the four codefendants' trials. Following their respective trials, Salgado was found guilty as the principal in the first degree murder of Manzella and the other three codefendants were found guilty of first degree murder on a theory of accountability. Salgado was also found guilty of attempted murder.

Although the evidence presented at codefendants' respective trials differed slightly, the evidence generally showed that in the early afternoon of September 24, 1993, Manzella was

_____

[1]No substantive differences exist between the versions of the Act in effect when petitioners filed their respective petitions. For consistency, we cite only the 2000 version.

2

driving around with Balthazar when they observed occupants of a red car in front of them display gang signs. Rodriguez was driving the red car, in which codefendants and three women were passengers. At that time, Rodriguez, Chaidez, Muniz and Salgado were, respectively, 18, 16, 16 and 17 years old. Some of the red car's occupants also testified that after the victims displayed gang signs, codefendants determined the victims were in a rival gang. When Balthazar suggested that Manzella avoid a confrontation with the red car's occupants, Manzella turned onto a different street. The red car then reversed its direction and followed the victims. After the victims were forced to stop for a fire truck near the intersection of Belmont and Cicero, the four codefendants exited the red car. As codefendants approached the victims' car, two of them shouted "Cobra Killer" and "Disciple Killer." Rodriguez broke the driver's side window and hit Manzella. Chaidez attempted to break the side windows and either he or Rodriguez kicked in the windshield. The victims then crouched down in the front seat. After Muniz broke the rear window with a baseball bat, Salgado fired two shots into the rear window, both of which struck and killed Manzella.

On December 7, 1994, the court sentenced Salgado to 50 years' imprisonment for first degree murder and a consecutive 20-year prison term for attempted murder. The court sentenced Rodriguez on the same day to 40 years' imprisonment for murder. On January 5, 1995, the court sentenced Muniz to 48 years' imprisonment and subsequently sentenced Chaidez 40 years' imprisonment four days later.

In sentencing codefendants, the court stated, "[i]f ever there was a hierarchy of responsibility, it's here. First I point out the most obvious, Victor Salgado was convicted of 2

3

1-08-1006, 1-08-1007 & 1-08-1013

offenses. First degree murder and attempt first degree murder. The other 3 were not." The court found that Salgado, as the codefendant who inflicted the fatal wounds, was the most responsible and Muniz, as the individual who broke the window out with the bat, was the next most responsible because he provided Salgado with an unobstructed view into the car so he could fire at close range. In addition, Rodriguez, the driver, was the third most culpable and Chaidez was the least culpable. Although the court acknowledged that codefendants had no prior convictions and were young, it found that the crime occurred in a busy area, was gang-related, involved a chase, a violent assault and a shooting. Furthermore, the court considered the need to deter other individuals from gang activity.

This court affirmed codefendants' convictions on direct appeal. People v. Salgado, 287 Ill. App. 3d 432 (1997); People v. Rodriguez, No. 1-95-0339 (1997) (unpublished order pursuant to Supreme Court Rule 23); People v. Muniz, No. 1-95-0783 (1997) (unpublished order pursuant to Supreme Court Rule 23); People v. Chaidez, No. 1-95-0308 (1996) (unpublished order pursuant to Supreme Court Rule 23(c)). In addition, we rejected the assertions of Salgado, Muniz and Chaidez that their respective sentences were an abuse of discretion.

SALGADO'S POSTCONVICTION PETITION

On March 23, 1998, Salgado filed a *pro se* postconviction petition under the Act, raising various claims for ineffective assistance of trial and appellate counsel, including his claim that appellate counsel should have challenged the excessive and consecutive nature of his sentences.

4

It appears that on March 10, 2000, Salgado's appointed counsel filed a supplemental postconviction petition, alleging that trial and appellate counsel were ineffective for failing to challenge Salgado's consecutive sentences and the State's submission of an attempted murder instruction.

Judge James Epstein granted Salgado's postconviction petition on October 13, 2000, finding that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence to sustain Salgado's attempted murder conviction and for failing to challenge the submission of the attempted murder instruction to the jury. As a result of Judge Epstein's decision to vacate the attempted murder conviction, he found it unnecessary to consider whether consecutive sentences were properly imposed. Judge Epstein found that in sentencing Salgado for murder, Judge Singer had considered in aggravation that Salgado had also been convicted of attempted murder. Accordingly, Judge Epstein found he was required to vacate Salgado's murder sentence and conduct a new sentencing hearing in the absence of the attempted murder conviction. The State did not appeal this order.

On December 1, 2000, Salgado was resentenced to 28 years in prison for murder. In addition to the mitigating evidence presented at Salgado's original sentencing hearing, primarily his youth and lack of prior convictions, defense counsel argued that Salgado was trying to make something of his life while in prison and presented extensive evidence regarding Salgado's accomplishments in prison. Judge Epstein considered the horrible impact of Salgado's action but found that when Judge Singer originally sentenced Salgado to 50 years' imprisonment, Judge Singer did not have evidence of how Salgado used his time in prison. Thus, Judge Epstein

believed he had a better picture of Salgado's rehabilitative potential than Judge Singer did. Judge Epstein further found that although many inmates waste their time in prison, Salgado had not done so.

CODEFENDANTS' POSTCONVICTION PETITIONS

While Salgado's postconviction proceedings were pending, on April 7, 1998, Rodriguez filed his first *pro se* postconviction petition, which the trial court dismissed on the State's motion. On appeal, we granted the public defender's motion to withdraw as counsel pursuant to Pennsylvania v. Finley, 481 U.S. 551, 95 L. Ed. 2d 539, 107 S. Ct. 1990 (1987), finding there were no issues of arguable merit and affirmed the trial court's judgment. People v. Rodriguez, No. 1-98-3367 (1999) (unpublished order pursuant to Supreme Court Rule 23).

On May 2, 2001, Rodriguez filed a successive *pro se* postconviction petition and memorandum of law, alleging, in pertinent part, that his 40-year sentence was disproportionate to the 28-year sentence received by Salgado, who was more culpable that Rodriguez. On August 27, 2001, Judge James Egan dismissed Rodriguez's petition as frivolous and patently without merit. Rodriguez appealed and the State confessed error because the trial court had dismissed the petition more than 90 days after it was filed (see 725 ILCS 5/122-2.1 (West 2000)). We remanded for Rodriguez's petition to be docketed for further consideration under the Act. People v. Rodriguez, No. 1-02-0057 (2002) (dispositional order).

In June 2002 and January 2003, Chaidez and Muniz, respectively, filed their own *pro se*

6

postconviction petitions, challenging the disparity between Salgado's 28-year sentence and their considerably longer sentences. On April 25, 2006, appointed counsel for Rodriguez, Chaidez and Muniz filed supplemental petitions, again asserting that an arbitrary and unconstitutional disparity existed between their sentences and Salgado's 28-year sentence. Appointed counsel also argued that petitioners had improved themselves while incarcerated and attached documentation showing their accomplishments in prison. On April 17, 2007, Judge Egan denied the State's motions to dismiss the postconviction petitions and determined that the petitions should proceed to an evidentiary hearing.

At the commencement of an evidentiary hearing before Judge Mary Margaret Brosnahan on November 7, 2007, argument was held regarding petitioners' motion to bar the State from calling Judge Singer to testify at the evidentiary hearing and their alternative motion to limit Judge Singer's testimony. Petitioners argued that the State failed to appeal from Judge Epstein's order granting Salgado's postconviction petition and could not present Judge Singer's testimony to challenge Judge Epstein's determinations. They also argued that the existing trial record adequately showed Judge Singer's views and was more probative than any statements he made over 10 years later. In addition, petitioners argued that if Judge Singer testified, the trial court should not permit the State to question him regarding Judge Epstein's decision to grant Salgado's postconviction petition, vacate his attempted murder conviction or resentence him to 28 years in prison for murder. In response, the State did not challenge codefendants' relative levels of culpability as found by Judge Singer but argued that Salgado's 28-year sentence was arbitrary and resulted from a chain of errors, notwithstanding the State's failure to appeal Judge Epstein's

order granting Salgado postconviction relief. After hearing Judge Singer's proffered testimony, Judge Brosnahan found it was nearly impossible to determine whether Judge Singer's testimony was appropriate without hearing the testimony. As a result, the court denied the motions but offered to consider additional arguments following Judge Singer's testimony.

Judge Singer testified, in pertinent part, that he would have submitted an attempted murder instruction to Salgado's jury over his objection. Judge Singer also testified that at the original sentencing hearing, he pointed out that Salgado was convicted of two offenses, whereas the other codefendants were not, to explain why Salgado was receiving two sentences. In addition, Judge Singer testified that Salgado was the most culpable and he would not have imposed a lesser sentence on Salgado due to his good prison conduct after he was initially sentenced.

Following Judge Singer's testimony and further argument, Judge Brosnahan stated she would take under consideration the propriety of Judge Singer's testimony and decide the extent of its relevance to the ultimate ruling on the postconviction petitions. Petitioners' trial records were admitted into evidence, as well as certain evidence of petitioners' achievements in prison. In addition, petitioners argued that because they were similarly situated to Salgado, aside from their relative levels of culpability, their sentences were impermissibly disparate to his 28-year sentence. The State argued that petitioners' sentences were correct, Salgado's sentence resulted from Judge Epstein's errors and petitioners' rehabilitation was not to be rewarded.

At a hearing on February 7, 2008, Judge Brosnahan presented a written order dismissing the three petitions. Regarding petitioners' challenge to Judge Singer's testimony, the trial court

found his testimony regarding whether he took into account the attempted murder conviction in sentencing Salgado for murder was relevant, necessary and could not be obtained by other means, but struck Judge Singer's testimony regarding the propriety of submitting the attempted murder instruction to the jury and Judge Epstein's decision to resentence Salgado to 28 years in prison.

In dismissing the petitions, Judge Brosnahan found Judge Epstein's decision in the Salgado case had no effect on her decision because it was not an appellate court decision and she disagreed with the reasoning and logic which led to the reduction of Salgado's sentence. Specifically, she found Judge Epstein incorrectly determined that the evidence would not support an attempted murder instruction, that the State could not prove attempted murder and that Judge Singer took into account the attempted murder charge when sentencing Salgado for murder. As a result, she declined to use the 28-year prison term as a standard of comparison for petitioners' sentences. Judge Brosnahan stated that she could not be persuaded that what happened in Salgado's case "mandates a complete dismantling of the remaining three co-defendants' sentences which have already passed appellate scrutiny," and found that the sentences were consistent when initially entered. Accordingly, the court found petitioners failed to demonstrate their sentences were grossly disparate and dismissed the petition. Following arguments on April 3, 2008, the trial court denied petitioners' motions to reconsider the dismissal of their petitions. Petitioners now appeal.

## ANALYSIS

On appeal, petitioners assert the trial court erred in dismissing their petitions following an evidentiary hearing under the Act because they demonstrated a constitutional violation resulting

9

from an arbitrary disparity between their sentences and the lower sentence ultimately received by Salgado, who was similarly situated. This would appear to be a question of first impression under the Act, with these three petitioners contending that they are entitled to relief because their rights were violated when their more culpable codefendant got a reduced sentence by claiming that his rights were violated in the underlying trial. On its face, therefore, this appeal suffers from an uncorrectable infirmity because it does not claim error in the proceeding in which the three were convicted.

The Act provides a remedy to criminal defendants for substantial violations of their constitutional rights that occurred in their original trial. People v. Taylor, No. 107701, slip op. at 12 (March 18, 2010). A postconviction proceeding is collateral to, rather than an appeal from, the underlying judgment and permits the review of constitutional claims that could not have been adjudicated on direct appeal. Taylor, slip op. at 12; People v. Ortiz, 235 Ill. 2d 319, 328-29 (2009). In noncapital cases, there are three stages of proceedings under the Act, the third of which is an evidentiary hearing. People v. Beaman, 229 Ill. 2d 56, 71-72 (2008). During the third stage, the defendant carries the burden of presenting a substantial showing of a constitutional violation. People v. Pendleton, 223 Ill. 2d 458, 473 (2006).

We generally review the trial court's denial of a postconviction petition following an evidentiary hearing to determine whether it was manifestly erroneous, which occurs when an error is clearly plain, evident and indisputable. Ortiz, 235 Ill. 2d at 333. If no credibility determinations are necessary, *i.e.*, no new evidence is presented and the issues are purely legal questions, we review the trial court's judgment *de novo*, unless the presiding judge has some

relevant special expertise or familiarity with the trial or sentencing of the defendant. Beaman, 229 Ill. 2d at 72; Pendleton, 223 Ill. 2d at 473. In addition, this court has held that where the trial court made credibility determinations or factual findings that were unnecessary, so that our decision on review is not dependent on such findings, we review the trial court's decision *de novo*. See People v. Lane, 398 Ill. App. 3d 287, 296 (2010).

Although the parties agree that we are to review the trial court's decision under the manifest weight of the evidence standard, for reasons to be explained, our disposition in this case does not depend on any factual findings made by the trial court in dismissing the petitions. In addition, Judge Brosnahan did not have any special expertise or familiarity with petitioners' sentencing proceedings. Rather, the question of whether petitioners in this case demonstrated a substantial constitutional violation based on a sentencing disparity requires no credibility determinations and presents a purely legal issue. Thus, our standard of review is *de novo*.

An arbitrary and unreasonable disparity between sentences imposed on codefendants who are similarly situated is impermissible (People v. Godinez, 91 Ill. 2d 47, 55 (1982)), but a mere disparity in sentences is not alone a violation of fundamental fairness (People v. Martinez, 372 Ill. App. 3d 750, 759-60 (2007)). It is not the disparity that counts, but the reason for the disparity. Martinez, 372 Ill. App. 3d at 760; People v. Foster, 199 Ill. App. 3d 372, 393 (1990). A difference in sentences may be justified by factors including the codefendants' relevant character and history, their degree of culpability, their criminal records or their rehabilitative potential. Martinez, 372 Ill. App. 3d at 760; Foster, 199 Ill. App. 3d at 393. In addition, a defendant is not precluded from raising a disparate sentencing challenge merely because he was

sentenced prior to his codefendants by a different judge. People v. Banks, 241 Ill. App. 3d 966, 984 (1993). Our supreme court has also stated, albeit in a capital case, that a disparity between noncapital sentences presents a cognizable claim under the Act. People v. Caballero, 179 Ill. 2d 205, 215 (1997), but see People v. Caballero, 206 Ill. 2d 65, 75 (2002) (the supreme court stated it was required to ensure that capital cases are rationally distinguished from noncapital cases).

Initially, we question whether this was an error occurring in the original proceeding as required by the Act. Pursuant to section 122-1(a) of the Act, "[a]ny person imprisoned in the penitentiary who asserts that *in the proceedings which resulted in his or her conviction* there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both may institute a proceeding under this article." (Emphasis added.) 725 ILCS 5/122-1(a) (West 2000); see also People v. Keller, 353 Ill. App. 3d 830, 832-33 (2004) (the defendant's claim that the Department of Corrections misinterpreted his sentence was not cognizable under the Act, because it did not pertain to any flaw in the proceedings that occurred before his conviction); People v. Jones, 321 Ill. App. 3d 515, 519 (2001), citing People v. Flores, 153 Ill. 2d 264, 276-77 (1992) (ineffective assistance of postconviction counsel claims are beyond the scope of the Act because they are not based on an error that occurred in proceedings resulting in a conviction). It is undisputed that the proceedings which led to the imposition of codefendants' sentences did not result in a sentencing disparity, but rather, the disparity occurred several years after petitioners and Salgado were originally convicted and sentenced. Nonetheless, assuming this requirement is satisfied where a codefendant challenges his original sentence, we find no constitutional violation.

Here, the parties primarily dispute whether petitioners' sentences are to be compared with the 50-year sentence Salgado initially received from Judge Singer, or the 28-year sentence Salgado ultimately received from Judge Epstein. Nonetheless, even assuming that petitioners' sentences must be compared to Salgado's 28-year sentence, this does not end our inquiry. Rather, we must examine the reason for the disparity between the codefendants' sentences. Although petitioners argue they were less culpable than Salgado and were similarly situated to Salgado in terms of rehabilitative potential and their lack of criminal record, we do not find these factors to be exhaustive in examining the reason for a disparity between codefendants' sentences. We cannot ignore that the disparity between their sentences arose only when Judge Epstein determined that his decision to vacate Salgado's attempted murder conviction also required him to vacate Salagdo's murder sentence. Absent Judge Epstein's ruling, which we find to be erroneous, Salgado would not have been resentenced to 28 years in prison. Petitioners' argument that the doctrines of collateral estoppel and *laches* prevent us from examining how Judge Epstein's ruling contributed to the disparity between codefendants' sentences is misplaced. This would both ignore our duty to consider the reason for the sentencing disparity and misapply the aforementioned doctrines.

Application of the collateral estoppel doctrine requires that (1) the court entered a final judgment in the previous case; (2) the party against whom estoppel is asserted was either a party, or in privity with a party, in the previous case; and (3) the issue determined in the previous case is identical with the issue presented in the instant case. People v. Tenner, 206 Ill. 2d 381, 396 (2002), citing People v. Franklin, 167 Ill. 2d 1, 12 (1995). In addition to those threshold

13

requirements, in criminal cases, the mutuality requirement is necessary for the application of collateral estoppel. Franklin, 167 Ill. 2d at 12-13. Pursuant to that requirement, a criminal defendant may not use a prior judicial finding against the State unless the defendant himself was bound by the prior finding. People v. Martinez, 389 Ill. App. 3d 413, 418 (2009), citing Franklin, 167 Ill. 2d at 12. Reasons for requiring mutuality of parties in criminal cases include the State's interest in a full and fair opportunity to litigate an issue and the important interest in the enforcement of the criminal law. Franklin, 167 Ill. 2d at 13-14. The State's burden also differs regarding each individual defendant. Martinez, 389 Ill. App. 3d at 418.

We first observe that although Judge Epstein's order granting Salgado postconviction relief and Judge Epstein's separate order resentencing Salgado to 28 years in prison were both final, only the former order was appealable by the State. Compare People v. Scott, 194 Ill. 2d 268 (2000), citing 134 Ill. 2d R. 651(a) (where a postconviction trial judge decides that a defendant should receive a new sentencing hearing, the State may appeal that determination before the new sentencing hearing is held), and People v. Joyce, 1 Ill. 2d 225, 227 (1953) (same), with People v. Cosby, 305 Ill. App. 3d 211, 232 (1999) (the State cannot appeal sentencing issues (155 Ill. 2d R. 604(a)), and a reviewing court has no power to increase a defendant's sentence on appeal (155 Ill. 2d R. 615(b))).

More importantly, the mutuality requirement has not been satisfied in this case. We categorically reject petitioners' assertion that they were bound by Salgado's postconviction proceedings or resentencing proceedings. Stating the obvious, it was not their postconviction petitions that were being ruled on by Judge Epstein, but Salgado's. Similarly, the 22-year

sentence reduction was given solely to Salgado. In addition, we find petitioners' suggestion that the mutuality requirement should not be applied because they are not trying to use a judgment entered in favor of Salgado to their benefit, to be entirely disingenuous. Petitioners do not cite, and we do not find, any cases granting this court discretion regarding application of the mutuality requirement. Even if we had such discretion, petitioners are clearly asking us to give them the advantage of rulings in Salgado's favor without questioning the reasons or propriety of those rulings. Put another way, one wrong under the Act does not give these three rights under the Act that they otherwise would not be entitled to. Because petitioners were not bound by Salgado's postconviction proceedings or resentencing proceedings, the mutuality requirement has not been satisfied and we will not adopt the sophistry that petitioners would appear to be urging upon this court.

We also find *laches* does not prohibit the State from arguing that Salgado's murder sentence should not have been vacated. The *laches* doctrine bars claims brought by parties who neglect their rights to the detriment of other parties. People v. McClure, 218 Ill. 2d 375, 389 (2006). The application of *laches* requires demonstrating a lack of due diligence by the party asserting a claim and prejudice resulting to the party asserting the *laches* doctrine. People v. Wells, 182 Ill. 2d 471, 490 (1998).

We find petitioners have failed to demonstrate that they were prejudiced as a result of the State's failure to appeal Judge Epstein's order granting Salgado postconviction relief. As stated, the order vacating Salgado's 50-year sentence is separate from the order resentencing Salgado to 28 years in prison, an order which the State was not permitted to appeal. Petitioners assert they

15

have been prejudiced by the State's failure to appeal from the former order because "the resolution of [the appeal] would have governed over the proceedings below, rather than Judge Singer's testimony and the circuit court's own impressions of Judge Epstein's ruling." Any alleged benefit that would have inured to petitioners would necessarily be speculative at best. Had the State appealed, we very much doubt, for reasons we will explain, that any panel of this court would have affirmed the vacating of the 50-year murder sentence. Although petitioners also argue that the present appeal would not exist if Salgado's 50-year sentence had been reinstated on the State's appeal, we do not see how that would have benefitted petitioners. Accordingly, they have not demonstrated the prejudice necessary for the application of *laches*.

Petitioners correctly state that where the record suggests the length of a defendant's sentence for a particular offense may have been increased due to the existence of an additional conviction, and that additional conviction is subsequently vacated, it may be appropriate to vacate the first sentence and remand for resentencing. See People v. Johnson, 314 Ill. App. 3d 444, 451 (2000). Here, however, the record shows that Salgado's attempted murder conviction did not lead to an increased murder sentence. Petitioners and Judge Epstein have relied on the following isolated statements made by Judge Singer at sentencing:

> "First I point out the most obvious, Victor Salgado was convicted of 2
> offenses. First degree murder and attempt first degree murder. The other 3 were
> not."

When read in isolation, this may suggest the court considered Salgado's additional conviction for attempted murder as an aggravating factor as to his murder sentence. The facts of this case

16

demonstrate the folly of such an isolated reading.

It is undisputed that at sentencing, Judge Singer set forth the following hierarchy of culpability: Salgado, Muniz, Rodriguez and Chaidez. Judge Singer sentenced Salgado and Muniz, respectively, to 50 years' imprisonment and 48 years' imprisonment. Under these circumstances, the record shows that the mere two-year discrepancy between Salgado's sentence and the sentence received by Muniz resulted from their varying culpability, rather than Salgado's additional conviction for attempted murder. Had Judge Singer considered Salgado's attempted murder conviction in aggravation as to his murder sentence, Salgado would not have received a mere two-year increase from Muniz's sentence. Because the record shows that the attempted murder conviction had no bearing on the sentence Judge Singer imposed on Salgado for murder, Judge Epstein's subsequent decision to vacate the attempted murder conviction had no meaningful effect on Salgado's murder sentence. Thus, we find Judge Epstein's decision to vacate Salgado's murder sentence was unwarranted. Although the lenient 28-year sentence subsequently imposed on Salgado may have been appropriate based on Salgado's rehabilitation in prison, we cannot ignore that Salgado should not have been placed in the position to be resentenced. See 730 ILCS 5/5-5-3(d) (West 2000) (where an original sentence is vacated and the case remanded to the trial court, evidence of the defendant's life, occupation and moral character "during the time since the original sentence was passed" may be presented).

To the extent that a disparity exists between codefendants' sentences, there is but one arbitrary sentence, the 28-year sentence received by Salgado. It is not within this court's power to correct the error leading to that sentence. Petitioners' sole claim to relief is impermissibly tied

17

to the gratuitous sentence reduction as a result of Judge Epstein's error. This falls short of showing a constitutional violation and no just cause would be furthered by the compounded error petitioners seek. Judge Brosnahan properly denied their petitions.

Relying on the special witness doctrine, petitioners also assert Judge Brosnahan erred in permitting Judge Singer to testify at the evidentiary hearing regarding whether he considered Salgado's attempted murder conviction in fashioning his murder sentence. Pursuant to the special witness doctrine, when a party in a criminal case requests the testimony of a special witness, including a judge, that party must (1) specify the testimony to be elicited from the witness; (2) state why the testimony is necessary and relevant to the party's case; and (3) state what efforts have been made to secure the same evidence through other means. People v. Willis, 349 Ill. App. 3d 1, 17 (2004). We review the court's decision whether to permit a special witness's testimony for an abuse of discretion. People v. Palacio, 240 Ill. App. 3d 1078, 1095-96, 1102 (1993).

Petitioners argue that Judge Brosnahan abused her discretion in permitting Judge Singer to testify because the trial transcript speaks for itself. As stated, we agree that the transcript speaks for itself. It shows that Judge Singer did not consider Salgado's attempted murder conviction in fashioning Salgado's murder sentence. Thus, Judge Singer's testimony was not necessary to the State's case and did not satisfy the special witness doctrine. Nonetheless, the evidence improperly admitted here merely duplicates evidence already in the record and in no way affects our review and we find the error was harmless. *Cf.* People v. Reynolds, 284 Ill. App. 3d 611, 613-15, 617 (1996) (where the defendant filed a postconviction petition alleging his trial

judge made an improper *ex parte* comment to his trial counsel, the postconviction judge improperly denied the defendant's motion to subpoena the trial judge and reversal was required for further proceedings on the defendant's postconviction petition). Petitioners would gain nothing from a second evidentiary hearing.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

FITZGERALD SMITH, and HOWSE, JJ., concur.

| | |
|---|---|
| Please Use Following Form:<br><br>Complete TITLE of Case | REPORTER OF DECISIONS – ILLINOIS APPELLATE COURT<br>(Front Sheet to be Attached to Each Case)<br><br>THE PEOPLE OF THE STATE OF ILLINOIS,<br>    Plaintiff-Appellee,<br><br>    v.<br><br>VICTOR RODRIGUEZ,<br>    Defendant-Appellant.<br>_____<br><br>THE PEOPLE OF THE STATE OF ILLINOIS,<br>    Plaintiff-Appellee,<br>    v.<br><br>OMAR CHAIDEZ,<br>    Defendant-Appellant.<br>_____<br><br>THE PEOPLE OF THE STATE OF ILLINOIS,<br>    Plaintiff-Appellee,<br><br>    v.<br><br>FRANCISCO MUNIZ,<br>    Defendant-Appellant. |
| Docket No.<br><br>COURT<br><br><br>Opinion Filed | No. 1-08-1006, 1-08-1007, 1-08-1013 (Cons.)<br>Appellate Court of Illinois<br>First District, FIFTH Division<br><br>June 30, 2010<br>(Give month, day and year) |
| JUSTICES | JUSTICE LAVIN delivered the opinion of the court:<br><br>Fitzgerald Smith and Howse, JJ.,                    concur |
| APPEAL from the Circuit Ct. of Cook County, Criminal Div.<br><br><br><br><br>For APPELLANTS, John Doe, of Chicago.<br><br>For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)<br><br>Also add | Lower Court and Trial Judge(s) in form indicated in the margin:<br><br>The Honorable_____ Mary Margaret Brosnahan, Judge Presiding.<br><br>Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.<br><br>Attorneys for **Respondent-Appellee**:    Anita Alvarez, State's Attorney<br>The People    Alan J. Spellberg, Rimas F. Cernius, Nancy Colletti, Of Counsel<br>    County of Cook<br>    Room 309, Richard J. Daley Center<br>    Chicago, IL 60602<br>Attorneys for **Petitioners-Appellants**:    Michael Pelletier, State Appellate Defender<br>Victor Rodriguez    Rebecca I. Levy, Assistant Appellate Defender.<br>Omar Chaidez    203 N. LaSalle St., 24th floor<br>Francisco Muniz    Chicago, IL 60601<br>    312.814.5472 |